JOSEPH DICKSON, Respondent, v. THE MERCHANTS'
ELEVATOR COMPANY, Appellant.

St. Louis Court of Appeals, April 21, 1891.

1.  **Bills of Lading:** EFFECT OF TRANSFER. A bill of lading is a
    symbol of the property for which it was given; the transfer of it
    for value, by indorsement and delivery, passes to the transferee
    whatever title the transferor had to the property at the time. *Held*,
    accordingly, that such transferee's title is superior to the lien
    claim of a person, to whom the carrier delivered the property for
    charges against the transferor on prior consignments.

2.  **Conversion:** RIGHT OF ACTION. Where a railway company
    wrongfully delivers goods carried by it, the fact, that a recovery
    therefor could be had against it, is no defense to an action for the
    conversion of the goods against the person to whom the same were
    delivered.

3.  **Practice, Trial:** NECESSITY OF INSTRUCTION. *Held* that a theory
    depending upon a question of fact could not be presented on
    appeal, where that question had not been submitted to the trier of
    the facts by instruction.

4.  **Conversion:** ASSIGNABILITY OF CLAIM: EFFECT OF TRANSFER OF
    BILL OF LADING. A claim for the conversion of goods is assign-
    able, and the transfer of a bill of lading will pass to the transferee
    a claim of the transferor for the conversion of the goods repre-
    sented by such bill.

*Appeal from the St. Louis City Circuit Court.*—HON.
DANIEL D. FISHER, Judge.

AFFIRMED.

*Laughlin, Kern & Tansey*, for appellant.

*Dickson & Smith*, for respondent.

THOMPSON, J.—This was an action for damages for
the conversion of four carloads of wheat. The answer
was a general denial. The case was tried before the

court sitting as a jury, and the trial resulted in a finding and judgment for the plaintiff. The defendant appeals and assigns for error: *First*, that the court erred in admitting evidence offered by the plaintiff; *second*, that the court erred in refusing instructions for a nonsuit offered by the defendant. As the defendant does not point out any ruling in admitting evidence offered by the plaintiff, which he wishes us to consider under the first assignment, we shall lay that out of view, and deal exclusively with the second.

The evidence, so far as it is necessary to state it, was to the effect that one Thomas Best, a grain dealer of Kansas City, entered into a contract with the defendant, through its agent O'Neill, at Kansas City, for the sale of certain grain to the defendant; that the defendant was a corporation, doing business and having an elevator at St. Louis; that, in pursuance of this contract, Best shipped to the defendant eight carloads of wheat and drew a draft against the consignment, and had it discounted by a banker in the ordinary way; that after some difficulty, growing out of the fact that the wheat failed to pass the St. Louis inspection, the defendant paid the draft; that, on the sixteenth day of August, 1888, Best entered into a contract for the purchase of the wheat in controversy in this action from a Kansas City corporation, known as the Pierce Farmers Commission Company; that, on the twenty-eighth of August, the wheat was put on board four cars of the Wabash Railway Company, at Kansas City, for shipment to St. Louis; that a bill of lading in the usual form was issued therefor by the railway company to the Pierce Farmers Commission Company, and was by said company indorsed in blank and delivered to Best; that this bill of lading was made out to " shipper's order;" that Best thereupon indorsed his name upon it, and wrote across it the words, "Notify Merchants' Elevator Company;" that thereupon Best drew a draft for the sum of $1,800 against this defendant, the Merchants'

Elevator Company, and, annexing the bill of lading to the draft, procured the draft to be discounted by the German American Bank, of Kansas City, in the usual way ; that the draft came back to the German American Bank dishonored by the defendant; that, in the meantime, the Wabash Railway Company committed the mistake of delivering the wheat to the defendant without exacting a surrender of the bill of lading; that the German American Bank notified Best that his draft had been dishonored and returned, and required him to take it up; that he thereupon entered into an arrangement with the bank, whereby the bank allowed him to take the bill of lading to the railway company for the purpose of procuring a new bill of lading, to the end that he might vary the consignment, send the goods to another consignee, and draw a new draft against the new consignee with the new bill of lading attached; that he thereupon took the original bill of lading to the agent of the railway company at Kansas City, who, not knowing that the agent at St. Louis had delivered the wheat to the defendant, but supposing that it was still in the custody of the railway company, took up the original bill of lading, and issued to Best a new bill of lading for the shipment of the wheat to J. L. Rodgers & Co., of Baltimore; that, with this new bill of lading, Best returned to the bank, drew a draft for $1,800 against J. L. Rodgers & Co., of Baltimore, and again delivered the draft and bill of lading to the bank, which draft and bill of lading the bank received in lieu of the prior draft and bill of lading; that J. L. Rodgers & Co., of Baltimore, paid the draft drawn against them, although they did not get the wheat; that, as some doubts arose as to the validity of the second bill of lading, J. L. Rodgers & Co. procured from the railway company the first bill of lading, and thereafter assigned *both* bills of lading to this plaintiff for the consideration of $1,800 paid them by the plaintiff. It should also be stated, though that is perhaps not material, that with

the proceeds of the first draft, discounted by the German American Bank of Kansas City, Best actually paid to the Pierce Farmers Commission Company the purchase price of the wheat. The evidence adduced by the plaintiff also tended to show that the wheat was delivered by the Wabash Railway Company to the defendant *for custody* merely, according to the regular course of business of that company in respect of wheat received at St. Louis, consigned to that place, by which course of business it delivered such wheat to some one of the elevator companies with which it did business.

Although the answer was a general denial only, the defense attempted to be set up by the defendant in its evidence was, that it had sustained a loss on the previous eight carloads which had been shipped to it by Best, and, accordingly, that it had the right to recoup itself by holding these four carloads for the balance due it from Best on general account. The plaintiff does not dispute that the defendant would have this right, provided Best were the plaintiff in this action. But the position of the plaintiff is that, as Best did not ship the wheat to the defendant for credit on general account, but as Best parted title to the wheat to a third party, namely, the German American Bank, while it was in transit in the hands of the carrier, this defense is not available to the defendant. The soundness of this proposition is perfectly clear. The plaintiff does not deny that the defendant is entitled to hold this wheat to secure his lien for any special charges for advances, storage, or otherwise, to which it may be entitled in respect of this particular consignment; and the court in a declaration of law announced this principle. But the plaintiff gave evidence to the effect that he tendered all such charges to the defendant, which tender was refused on the ground set up by the defendant that it had the right to hold the wheat for the balance due from Best on general account.

Having thus stated the case there seems little more for us to say. The judgment was manifestly the only judgment which could have been rendered by the court upon a conceded state of facts. By the statute of this state (R. S. 1889, sec. 744), and also by the law merchant, as understood and constantly administered in this country, a bill of lading is a symbol of the goods in such a sense that the transfer of it, by indorsement and delivery for value, passes to the transferee whatever title to the goods the transferor had at the time. *Skilling v. Bollman*, 6 Mo. App. 76; s. c., affirmed, 73 Mo. 665; *Kirkpatrick v. Railroad*, 86 Mo. 341; *Vallé v. Cerré*, 36 Mo. 575; *Davenport Nat. Bank v. Homeyer*, 45 Mo. 145; *Missouri Pacific Ry. Co. v. McLiney*, 32 Mo. App. 166; *Dows v. Bank*, 91 U. S. 618, 631. If, after a consignment of goods has been put in the hands of a carrier for shipment to a distant consignee, the latter can, on receiving the goods wrongfully from the carrier, hold them for any balance due on general account from the consignor, notwithstanding the fact that the consignor has in the meantime delivered the bill of lading for security for a draft to a bank, which bank has advanced money upon the draft, then the clause of our statute which makes bills of lading negotiable by written indorsement thereon and delivery in the same manner as bills of exchange and promissory notes (R. S. 1889, sec. 744) would be idle and nugatory, and no banker would dare to advance money on this species of security.

That such is not the law was stated by the supreme court of this state, speaking through Judge HOLMES, in the case of *Vallé v. Cerré*, already cited. "The consignor," said the learned judge, "in such case may himself transfer the property by assignment or delivery of one of the bills of lading to any other person,—as for instance to his banker, with whom he negotiates his drafts against the shipment, and that will vest the property in the assignee, even though the consignee

receive a second bill of lading and the goods from the
carrier, and endeavor to hold them to cover a general
balance of account against the consignor, while at the
same time refusing to accept his bill, because he had
exceeded his authority, and was already largely
indebted to him ; and such was the case of. *Allen v.
Williams* (12 Pick. 297); for, in that case, it was the
manifest intention of the consignor that the shipment
should not go to the consignee, unless he first accepted
the bill. The delivery of the bill of lading and the
goods by the carrier, being without authority, vested
no title in the consignee, against an actual transfer of
the property by the consignor himself, even though
they had come into his possession ; and, accordingly, it
was held that the matter of the previous dealings of
the parties and the balance of account was wholly
immaterial. The conduct and acts of the consignor
were utterly inconsistent with any supposition or intent
that the consignment was to go to his credit on the
general balance of account, in pursuance of any pre-
vious arrangement.''

The case of *Davenport Nat. Bank v. Homeyer*, 45
Mo. 145, also shows quite conclusively that in such a
case the consignee of the goods, although they may
come into his actual custody, gets no title to them as
against the holder of the bill of lading, and that the
holder of the bill of lading, and not the consignee, is
entitled to the proceeds of their sale, after deducting
any lawful charges of the consignee in respect of the
particular goods. In like manner, the supreme court
of the United States speaking with reference to a case,
where the shipper procured the bills of lading to be
issued deliverable to the cashier of a bank, and drew
against the consignment, and annexed the bills of lad-
ing to his draft, and delivered the same with the draft
to the banker, which the latter discounted, said :
'' These bills of lading unexplained are almost conclu-
sive proof of an intention to reserve to the shipper the

*jus disponendi*, and prevent the property in the wheat from passing to the drawees of the drafts." *Dows v. Bank*, 91 U. S. 618, 631.

But it is argued that the railroad company was guilty of a conversion in turning the wheat over to the defendant, and that the right of action is accordingly in the railroad company, and not in this plaintiff. Counsel for the defendant, in their printed argument, say: "That the railroad company, in delivering this wheat to the Merchants' Elevator Company (this defendant), was guilty of conversion, scarcely needs an authority to support it." This proposition is quite clear, and the statement of it renders it equally clear that the defendant has exhibited no defense to this action as against this plaintiff. It is not clear how this defendant can acquire a title to the goods, which it can hold as against the real owner through the tort of the railroad company in delivering the goods to the defendant. If the railroad company, in delivering them to the defendant, was guilty of a conversion, the defendant in holding them adversely to the shipper must be equally guilty.

But it is argued that, when the second bill of lading was issued by the railroad company to Best, the first bill of lading was a "dead bill of lading;" that the property had already passed out of the custody of the railroad company, and that it was thereafter not competent for it to issue a bill of lading in respect of it; and from this the conclusion is deduced that the second bill of lading, with which the draft was drawn against J. L. Rodgers & Co., of Baltimore, was not operative to pass title to the goods, and that, therefore, this plaintiff got no title to them through the assignment to him by Rodgers & Co. of this bill of lading. Whatever force there may be in this objection is done away with by the consideration that the plaintiff is the holder by regular assignments of *both* bills of lading. If the second one is not good, then the one which was delivered up to

the railroad company in order to procure it to issue the other is good.

Finally, it is argued that this action ought to have been brought in the name of Best, in order that the defenses here attempted by the defendant could be made available as a counterclaim against the plaintiff. If the legal title to the goods had not passed out of Best by the assignment of the first bill of lading to the German American Bank, or if the legal title had revested in him by what was done after his draft was dishonored by the defendant, and had not subsequently been divested from him, then this suggestion might be available. Indeed, the only crevice in which to drive the wedge of a defense in this case seems to lie in the fact, that, after his draft on the defendant drawn against this shipment had been dishonored and returned to the bank at Kansas City which had discounted it, the bill of lading was redelivered to Best, and that he took it to the railroad company, and there procured the issuing of the second bill of lading, at the time when the goods were actually in the hands of this defendant. If this transaction, *ipso facto*, took the title out of the bank and revested it in Best, then there might be room for letting in this defense. But we observe that this is contrary to the manifest intention of Best and the German American Bank, as shown by all the evidence speaking upon the question. There was no intention to revest the title in Best so as to deprive the bank of the security of the first bill of lading, or to do anything more than to vary the consignment, so as to enable Best to draw a new draft on the new consignee. But it is to be observed that this question of the revesting of the title in Best, after it had passed out of him to the bank was not submitted to the trial court on any instruction, and is, therefore, not to be considered here.

That the plaintiff, as the assignee of the bills of lading, has the right to maintain this action is shown by the decision of this court in *Hamlin v. Carruthers*, 19

Mo. App. 567, where it was held that the cause of action, which the holder of the bill of lading has against the consignee of the goods for their conversion, is assignable under the statute of this state.

It is ordered that the judgment of the circuit court be affirmed. All the judges concur.